UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SKANSI MARINE, LLC | CIVIL ACTION |
| VERSUS | NO. 22-2128 |
| OFFSHORE AVIATION, LLC | SECTION M (2) |

**FINDINGS OF FACTS & CONCLUSIONS OF LAW**

This is a case involving claims for breach of contract on a bareboat charter agreement for the *M/V Meg L. Skansi* (the "*Meg*"), an offshore supply vessel owned by plaintiff Skansi Marine, LLC ("Skansi Marine"). Skansi Marine filed this suit against defendant Offshore Aviation, LLC ("Offshore Aviation") alleging that Offshore Aviation is obligated by contract to pay Skansi Marine the amount of $1,387,595.36 for loss of use and various costs and expenses incurred in repairing the vessel, plus an additional amount for attorney's fees.[1]

This matter was tried to the Court, sitting without a jury, over five days. Having considered the evidence admitted at trial, the arguments of counsel, post-trial submissions, and the applicable law, the Court issues its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such, and vice versa.[2]

---

[1] R. Docs. 1; 62.

[2] Before trial, Offshore Aviation filed a motion to strike witnesses that it contended were disclosed untimely by Skansi Marine in a supplemental witness list filed well after the established deadline for such lists. R. Doc. 56 (citing R. Doc. 44). Skansi Marine opposed the motion (R. Doc. 59). The witnesses were Mitzi Alario, Andy Naquin, Mark Compeaux, Robert Perez, and Anthony Pitre. R. Doc. 44. At trial, Skansi Marine offered testimony from Alario (deposition) and Naquin (live), but not the others. Alario and Naquin testified as to the market for chartering vessels similar to the *Meg,* and potential offers to charter the *Meg*, in the summer of 2022. This Court considered the testimony and finds it speculative and unpersuasive. They testified as to jobs the *Meg* possibly could have performed in the summer of 2022, but there was no evidence of firm offers or proposed charter parties. Skansi Marine, relying on this speculative testimony seeks $1,062,675.25 in lost profits, which assumes that the *Meg* would be chartered every day for 325 days at a rate of $3,269.77 per day. This claim is unsupported considering that there is no evidence of the

## FINDINGS OF FACT

### I.   JURISDICTION

1.     This Court has jurisdiction over the claims in the complaint under the admiralty and maritime laws of the United States, 28 U.S.C. § 1333, and Rule 9(h) of the Federal Rules of Civil Procedure.

2.     Venue is appropriate in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391(b), because a significant portion of the events at issue occurred within the district.

### II.   THE PARTIES

3.     Skansi Marine is a Louisiana limited liability company that owns and operates offshore supply vessels, including the *Meg*.[3]  David Skansi has owned and operated Skansi Marine for 33 years.[4]

4.     Offshore Aviation is a Maryland limited liability company that offers a range of services designed to support the military, including maritime and aviation assets, deployed communications, and logistics support.[5]  Robert Hicks is the owner and chief executive officer of Offshore Aviation.[6]

---

*Meg* earning such a high day rate or that it could have been fully employed during the relevant time.  Further, as will be explained herein, the Court is not awarding lost profits to Skansi Marine.  Considering that the testimony is not pivotal to this Court's opinion, the late disclosure is harmless, and the motion to strike (R. Doc. 56) is DENIED.

    Also before trial, Skansi Marine filed a motion to prohibit Offshore Aviation from offering at trial paint invoices that were not produced timely and to impose an adverse inference regarding Offshore Aviation's supposed communication with another vessel owner pertaining to a charter party that commenced on January 7, 2022.  R. Doc. 53.  Neither of these items was pivotal at trial, so the late disclosure of these documents is likewise harmless, and the motion is DENIED.

[3] R. Doc. 52 at 1.
[4] Testimony of David Skansi.
[5] R. Doc. 52 at 1-2.
[6] Testimony of Robert Hicks.

### III.   THE *MEG* AND PRE-CHARTER MAINTENANCE

5.      The *Meg* is a 170-foot-by-36-foot offshore supply vessel that was built in 2001, and rebuilt in 2022.  It currently operates under United States Coast Guard ("USCG") subchapters L and I.[7]

6.      The *Meg* was in "cold stack" in the Harvey Canal near New Orleans, Louisiana, for about a three years before Skansi Marine began charter negotiations with Offshore Aviation in April or May 2019.[8]

7.      While the vessel was in cold stack, Skansi Marine's port captains, Kyle Walker and Chad Berthelot, maintained the vessel by cranking the engines and pumps, turning valves, moving the steering, engaging the clutches, and running the electronics.[9]

8.      In March 2019, Walker and Berthelot brought the *Meg* out of cold stack and were on the vessel every day preparing it for a different job that did not come to fruition.  They also repaired items necessary to pass USCG inspection.[10]

### IV.   THE INITIAL CHARTER PARTY AND USCG SUBCHAPTERS L & I

9.      In early May 2019, Offshore Aviation was searching for an offshore supply vessel to perform certain government work that it was contractually obligated to complete by a certain date.  The work was to begin on June 1, 2019.[11]

10.     Captain James Phillips with Offshore Aviation contacted Skansi to discuss chartering the *Meg*, indicating that Offshore Aviation needed a USCG subchapter I vessel by June

---

[7] Exhibit 124.  Subchapter L sets out the requirements for USCG certification of offshore supply vessels, *see* 46 C.F.R. §§ 125.100-.190, while subchapter I sets out the requirements for USCG certification of cargo and miscellaneous vessels, *see id.* §§ 90.01-.35.  Generally, subchapter I calls for additional equipment and structural components than does subchapter L.  *See* Exhibits 1, 24.
[8] Testimony of Chad Berthelot.
[9] Testimony of Skansi, Berthelot.
[10] Testimony of Skansi, Berthelot, Kyle Walker.
[11] Exhibit 162.

1, 2019.  Skansi discussed pricing with Phillips a few times and then continued negotiating a charter agreement with Hicks.[12]

11.     The *Meg* was a USCG subchapter L vessel at the time.  Because Offshore Aviation wanted a USCG subchapter I vessel, Skansi offered to introduce Offshore Aviation to Anil Raj, a marine architect who had worked with Skansi Marine a few times and owned the firm that designed the *Meg* and her sister vessel, the *M/V Nick L. Skansi*.[13]

12.     Skansi and Hicks communicated via email with Raj about helping to outfit the *Meg* as a USCG subchapter I vessel.[14]

13.     Prior to the execution of the charter party and delivery of the *Meg*, Offshore Aviation communicated directly with outside vendors to procure the equipment necessary to outfit the *Meg* for USCG subchapter I certification.[15]

14.     Several pre-execution drafts of the charter party that were exchanged stated in section 8.2 that the *Meg* would be delivered to Offshore Aviation with a USCG subchapter L certificate of inspection.[16]

15.     On May 24, 2019, Hicks executed a version of the charter party that stated in section 8.2 that the *Meg* would be delivered to Offshore Aviation with a new USCG subchapter L certificate of inspection.[17]

---

[12] Testimony of Skansi.
[13] *Id.*
[14] Exhibit 1.
[15] Exhibits 2, 3, 4; Testimony of James Phillips.
[16] Exhibits 5, 6, 7, 8, 102, 103.
[17] Exhibit 77; Testimony of Hicks.

16.     Later in the day on May 24, 2019, Skansi sent Hicks another version of the charter party with changes made by Skansi's attorney.  This time, section 8.2 said that the *Meg* would be delivered to Offshore Aviation with a new USCG subchapter I certificate of inspection.[18]

17.     Effective May 31, 2019, the parties entered into the bareboat charter option agreement (the "2019 charter") for the *Meg*.  The 2019 charter had a term of twelve months with a purchase option in favor of Offshore Aviation.  The charter hire was $2,250 per day, representing $2,000 for the vessel and $250 for "warranty" payments.  Skansi Marine agreed to deliver the vessel in good condition and warrantied the cost of machinery failure within the first 30 days of the contract's commencement.  Section 8.2 stated that the vessel would be delivered to Offshore Aviation with a new USCG subchapter I certificate of inspection.[19]

18.     On May 31, 2019, Hicks and Skansi signed a delivery and acceptance certificate for the *Meg*.[20]  At this point, Offshore Aviation accepted the vessel "in apparent good order and condition" even though it was without the USCG subchapter I certificate of inspection.  While both Skansi and Hicks listed certain exceptions or contingencies on the delivery and acceptance certificate, none of them pertained to the status of the *Meg* as a USCG subchapter I or L vessel.

19.     The 2019 charter required that an on-charter survey be performed to document the condition of the *Meg* before it went to work for Offshore Aviation.[21]

20.     Harold Held with Qubed Limited, L.C. conducted the on-charter survey of the *Meg* on May 17, 2019, and May 29, 2019, which was documented in his June 3, 2019 report.[22]

---

[18] Exhibit 9.  Skansi contends that the change from subchapter L to subchapter I in paragraph 8.2 was a "scrivener's error" that inexplicably occurred when his counsel re-paginated the document.  Testimony of Skansi.  The Court, however, does not have enough evidence to, and need not, decide this issue.
[19] Exhibit 11.
[20] *Id.*
[21] *Id.*
[22] Exhibit 12.

21.     After taking possession of the *Meg*, Offshore Aviation invested time and money to purchase and install the equipment necessary to bring the vessel into compliance with USCG subchapter I.[23]

22.     The invoices for the equipment necessary to outfit the *Meg* for USCG subchapter I certification – which included a davit and platform, a lifeboat and cradle, and two inflatable life rafts and launchers – were sent to, and paid by, Offshore Aviation.[24]

23.     Offshore Aviation spent approximately $140,379.49 to purchase and install the equipment for the USCG subchapter I conversion of the *Meg*.  Offshore Aviation's surveyor applied a "customary 15% markup" to this figure to calculate the value of this "betterment to the vessel" as $161,435.21.[25]

24.     The *Meg* received the USCG subchapter I certification of inspection on September 26, 2019.[26]

## V.     MACHINERY WARRANTY ISSUE

25.     In the 2019 charter, Skansi Marine provided a conditional warranty on the *Meg*'s engines.  Section 5.2 of the 2019 charter provided:

> Should a failure of machinery described herein to perform as designed in the Vessel related specifically to the main engines, the gear boxes, the generators, or the bow thruster engine and not their attached systems to be discovered during the first month of the term, (the "Warranty Period"), Owner shall either repair or pay 100% of the cost to remedy the condition.[27]

---

[23] Exhibits 51, 55; Testimony of Hicks.
[24] Exhibits 3, 4; Testimony of Skansi.
[25] Exhibit 55.
[26] Exhibit 23.
[27] Exhibit 11.

6

26.     Section 5.2 further provided that Offshore Aviation had to take specific steps to avail itself of the warranty, including, *inter alia*, that Skansi Marine's representatives would "be allowed to make decisions on how best to get the vessel back up and running."[28]

27.     On June 11, 2019, during the *Meg*'s voyage from Louisiana to Maryland, the vessel experienced issues with the main engines and RPM performance.[29]

28.     Offshore Aviation contacted Cummins, Inc. ("Cummins"), the engine manufacturer, to investigate the issue. The Cummins technicians diagnosed the problem to be related to the vessel's turbochargers and recommended that they be replaced.[30]

29.     While Skansi Marine was contacted by Cummins about the problem, Skansi Marine's representative, Kyle Walker, disagreed with the Cummins assessment and blamed the RPM issue on Offshore Aviation's operation of the vessel with low levels of fuel in the day tanks. As a result, Skansi Marine concluded that Cummins would not "listen" to Walker about how to address the engine problems.[31]

30.     Contemporaneously, Skansi Marine refused to cover or contribute to the cost of Cummins's work, and by letter dated June 14, 2019, demanded the return of the vessel.[32]

31.     Offshore Aviation paid Cummins approximately $25,000 to repair the engines.[33]

32.     The repairs performed by Cummins were not covered by the limited warranty because Offshore Aviation did not permit a Skansi Marine employee to decide the course of action as was required by the warranty clause in the 2019 charter. Thus, Offshore Aviation must bear this cost.

---

[28] *Id.*
[29] Exhibit 111; Testimony of Hicks.
[30] Exhibit 18; Testimony of Hicks.
[31] Testimony of Skansi, Walker.
[32] Exhibit 111.
[33] Exhibit 18; Testimony of Hicks.

## VI.   SUBSEQUENT CHARTER PARTIES

33.   When the 2019 charter expired at the end of May 2020, the parties entered into an interim agreement continuing the charter arrangement on a month-to-month basis while they negotiated an extension of the 2019 charter.[34]

34.   Beginning August 30, 2021, Skansi Marine and Offshore Aviation effectively extended the 2019 charter by entering into a new bareboat charter agreement (the "2021 charter"). The charter hire under the 2021 charter was reduced to $1,700 per day, removing the warranty premium, and Offshore Aviation no longer had the option to purchase the *Meg*.  The contract had a 12-month term with an option for a six-month, or month-to-month, extension.[35]

35.   Skansi Marine agreed to pay Offshore Aviation for the fuel, oil, and filters on board the vessel at the time of redelivery.[36]

36.   The 2021 charter also provided that the original on-charter survey performed by Held of Qubed in 2019 would govern, and Offshore Aviation was required to "continue to maintain or re-deliver the vessel according to the 'On Charter Survey,' and or this contract."[37]

37.   Offshore Aviation also had to redeliver the *Meg* "in serviceable condition, clean, with good fresh paint, (less than one year old topcoat) less normal wear and tear per industry standards for the aggregate trade."  An off-charter survey was to be performed to assess the vessel's condition, and Offshore Aviation was responsible for any expenses necessary to restore the vessel to the condition it was in when the charter party began.[38]

---

[34] Exhibit 110; Testimony of Skansi.
[35] Exhibit 28.
[36] *Id.*
[37] *Id.*
[38] *Id.*

38.     Skansi Marine had the right, at any time and on reasonable notice, to inspect the vessel to determine whether it was being properly maintained.[39]

39.     In a paragraph addressing quiet enjoyment, the 2021 charter gave Offshore Aviation the right to cancel upon 30 days' written notice to Skansi Marine.  In whole, section 4.3 stated:

> Owner warrants that it has good title to the Vessel.  Owner agrees that, so long as no Event of Default shall have occurred hereunder and be continuing, Charterer shall have exclusive possession, control, use and quiet enjoyment of each Vessel during the Initial Term or any Extended Term applicable thereto, subject to the conditions of this Agreement, without hindrance or molestation by Owner, or any other person claiming the same by, through or under Owner, or because of the acts or omissions of Owner.  Should Owner breach this covenant, and by reason thereof, Charterer is deprived of the exclusive possession, control and use of any Vessel, Charterer may suspend the monthly payment with respect to such Vessel and terminate the charter of such Vessel shall be deemed redelivered (as is, where is) at the Owner's sole liability.  During the Extended Term, Charterer may exercise the right of cancellation of the Agreement.  Written notice of cancellation shall be provided to the Owner no less than thirty (30) days prior to the date of cancellation.  Upon termination of the charter of a Vessel by Charterer pursuant to this Section and return the Vessel pursuant to Article 17 (if applicable), all further obligation of Charterer to pay rent or with respect to such Vessel shall terminate with no additional liability.[40]

40.     The 2021 charter (like the 2019 charter) permitted Offshore Aviation to install additional items of machinery and equipment onto the vessel, and any such items would remain the property of Offshore Aviation, unless it expressly notified Skansi Marine of its intent to abandon its interest in those items.  Section 6.3 stated:

> Charterer may at any time alter or remove any items of machinery or equipment or may fit any additional items of machinery or equipment required to render the Vessel suitable for any purpose authorized under the provisions of this Article, provided that the Charterer return the vessel in good working order.  All such machinery and equipment shall meet all requirements of applicable regulatory authorities and in good working order.  Any additional machinery or equipment so fitted by Charterer shall remain the property of Charterer unless it expressly notifies Owner of its intent to abandon its interest in the machinery or equipment.  Owner

---

[39] *Id.*
[40] *Id.*

9

may demand the removal of any such equipment at the termination of this Charter, and the re-fitting of any original items of machinery or equipment, or their substantial equivalent, removed by the Charterer prior to redelivery.  The fitting and/or removal of machinery or equipment required by this Article, together with the making good of any damage caused by such fitting or removal, shall be performed by Charterer at its cost. [41]

41.     With respect to USCG subchapter I and L certifications, section 8.2 provided:

The Vessel is or will be on the Commencement Date documented under the flag of the United States and be eligible to engage in the coastwise trade.  The Vessel will be delivered with a new COI [*i.e.,* certificate of inspection] under Subchapter I. The Charterer will provide the crew for the topside inspection per USCG requirements.  Owner shall at its own cost expense maintain the COD [*i.e.,* certificate of documentation], and the Charterer will maintain at its own cost, expense, and fees the USCG COI and ABS [*i.e.,* American Bureau of Shipping] Loadline of the Vessel as a vessel of the United States eligible to engage in the coastwide trade throughout the terms of this Agreement.  Charterer will seek a compliance letter from the USCG to operate the Vessel under Subchapter L/I, but shall not do or permit any other act to be done or omission to occur, which might injuriously affect the documentation or registry of the Vessel.  If Charterer returns the Vessel for any reason and the Vessel arrives at the redelivery location under its own power, Charter[er] will at its own cost and expense redeliver the Vessel with new COI and ABS Loadline.[42]

42.     The 2021 charter contained a non-waiver provision (article 22):

No delay or omission in the exercise of any power or remedy herein provided or otherwise available to a party shall impair or affect the party's right thereafter to exercise the same.  Any extension time for payment hereunder or other indulgence granted to one party by the other shall not otherwise alter of affect the obligations of that party to the other hereunder with respect to any subsequent payments or default herein.[43]

43.     The 2021 charter further stated that, if any action between the parties arose with respect to that agreement, including one for default by Offshore Aviation, the prevailing party in the action would be entitled to recover all costs and reasonable attorney's fees actually incurred in enforcing the contract.[44]

---

[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*

44.     The parties agreed that neither would be liable for exemplary or punitive damages arising out of any breach of the 2021 charter, but Offshore Aviation agreed that if the *Meg* were out of service after redelivery due to its actions or fault, then it would be responsible for any loss of use of the vessel, including any damages resulting from that loss of use.[45]

45.     The 2021 charter also included a choice-of-law clause stating that it would be construed under, and the parties' rights and liabilities determined by, "the general maritime law of the United States, to the extent applicable, and otherwise in accordance with the internal laws of the State of Maryland."[46]

46.     In October 2021, Skansi, Walker, and Berthelot, went to Piney Point, Maryland, to inspect the *Meg*.  They spent six hours on the vessel checking the machinery and equipment, including the main engines, exhaust gaskets, and bilge tanks.  They were happy with the condition of the vessel at that time.[47]

47.     On May 27, 2022, Offshore Aviation made its last charter hire payment, which was for the period through April 30, 2022.[48]

**VII.    OFFSHORE AVIATION'S RETURN OF THE VESSEL**

48.     In January 2022, Hicks became concerned that Skansi Marine was going to sell the *Meg* to a direct competitor of Offshore Aviation, so he decided to cancel the 2021 charter.[49]

49.     On January 11, 2022, Offshore Aviation sent Skansi Marine a notice of cancellation, effective February 11, 2022.[50]

---

[45] *Id.*
[46] *Id.*
[47] Testimony of Walker.
[48] R. Doc. 52 at 8.
[49] Testimony of Hicks.
[50] Exhibit 32.

50.     Skansi Marine refused to accept Offshore Aviation's cancellation of the 2021 charter, insisting that Offshore Aviation had no right to cancel when Skansi Marine had not disturbed Offshore Aviation's quiet enjoyment of the *Meg*.[51]

51.     On February 14, 2022, Offshore Aviation advised Skansi Marine that the *Meg* had departed Piney Point, Maryland, and was enroute to Golden Meadow, Louisiana, for redelivery.[52]

52.     The *Meg* arrived in Golden Meadow on February 18, 2022, and was docked there until April 11, 2022.  The vessel was not fully crewed, no one was living on it, and no repairs were done during this time.  The vessel was moved to a dry dock on April 11, 2022.[53]

53.     Skansi Marine claims that it did not know that the *Meg* was back in Louisiana until late-February 2022, when another boat owner told Skansi that he saw the *Meg* in Golden Meadow.[54]

54.     On April 14, 2022, Skansi Marine personnel performed a limited preliminary inspection of the *Meg*.  They found issues with the air conditioning units, refrigeration equipment, and machinery.  They also saw signs of exhaust leaks in the engine room and clogged air intake filters for the main engines and generators.[55]

55.     On April 15, 2022, Skansi Marine prepared a "punch list" of items for Offshore Aviation to repair on the *Meg* before it would accept redelivery of the vessel.[56]

56.     Offshore Aviation acknowledged that it had to address the items on the punch list that were not noted to have been the *Meg*'s condition in the on-charter survey in order to redeliver the vessel under the 2021 charter.[57]

---

[51] Exhibit 33.
[52] Exhibit 36.
[53] Testimony of Ryan Nieten, Andrew Minster.
[54] Testimony of Skansi.
[55] Exhibit 41; Testimony of Skansi, Berthelot.
[56] Exhibit 41.
[57] Testimony of Nieten.

57.     Skansi Marine hired Austin Glass, a marine surveyor with Rivers & Gulf Marine Surveyors, Inc. ("Rivers & Gulf"), to perform an off-charter survey of the *Meg.*  Glass surveyed the *Meg* on May 2, 2022, along with representatives of Skansi Marine and Offshore Aviation. Glass provided a report dated May 9, 2022, listing 47 deficiencies from the on-charter survey that needed repair.[58]

58.     A May 16, 2022 USCG inspection note for the *Meg* stated that there was soot in the engine room that was possibly related to exhaust leaks.  Further, because of the deficiencies seen on the vessel at the inspection, the USCG found that the *Meg* did not meet minimum standards and a future full inspection would be required.[59]

59.     Skansi Marine lists the following issues with the *Meg* for which it claims Offshore Aviation is responsible:

   a.   exhaust leaks in the engine room related to the failure of the less-effective asbestos gaskets for the turbos that were installed by Cummins and a lack of maintenance;[60]

   b.   malfunctioning gauges;[61]

   c.   leaks of hydraulic oil from the steering system;[62]

   d.   incomplete repainting;[63]

   e.   rust on the deck;[64]

   f.   nonoperating liquid mud control valves;[65] and

---

[58] Exhibit 45; Testimony of Skansi.
[59] Exhibit 57.
[60] Testimony of Skansi, Berthelot.
[61] Testimony of Skansi.
[62] Testimony of Skansi, Berthelot.
[63] Testimony of Berthelot.
[64] *Id.*
[65] *Id.*

g.  failure of the electric switchboard fans due to soot buildup.[66]

60.  Skansi contends that the *Meg*, as returned in 2022, showed a complete lack of maintenance for a significant amount of time.[67]

61.  Offshore Aviation retained Timothy Anselmi of Central Maritime, LLC to perform its own off-charter survey of the *Meg*.  Anselmi inspected the *Meg* on May 17, 2022, and issued a corresponding report dated July 22, 2022.  Anselmi noted that the major deficiencies listed in Glass's reports had been remedied.  He opined that the items on Skansi's punch list could have been repaired in 30 days and that the vessel was ready to return to work by the third week of June 2022.[68]

62.  Glass reinspected the *Meg* on June 29, 2022.  He noted many of the same deficiencies as in his earlier report, and some new ones.[69]  However, Glass did not specifically check to see if the deficiencies stated in his May 2022 report had been corrected and was conducting the second survey to highlight issues that Skansi brought to his attention that were not included in the original report.[70]

63.  Skansi Marine lists the following issues with the *Meg* from Glass's second report for which it claims Offshore Aviation is responsible:

a.  the HVAC and refrigeration systems were not cooling;[71]

b.  main electrical switchboard fans in the engine room were not working;[72]

c.  oil accumulation and soot on the forward and aft generators;[73]

---

[66] *Id.*
[67] *Id.*
[68] Exhibit 142; Testimony of Timothy Anselmi.
[69] Exhibit 52; Testimony of Skansi, Austin Glass.
[70] Testimony of Glass.
[71] Testimony of Skansi, Berthelot.
[72] Testimony of Glass.
[73] *Id.*

    d.   improperly repaired bow thruster airbrake;[74] and

    e.   excess wiring that had not been removed.[75]

64.    Between February 18, 2022, and June 29, 2022, Offshore Aviation performed substantial work on the *Meg*, including repair and maintenance work on the generators, main engines, gauges, mud pump, bridge electronics, public address system, and alarm setpoints. Offshore Aviation believed it had resolved the issues on Skansi Marine's April 15, 2022 punch list, those on the USCG form 835 issued after the May 16, 2022 inspection, and the purported deficiencies listed in the Rivers & Gulf reports.[76]

65.    Following those repairs, the USCG issued to the *Meg* an updated certificate of inspection and ABS issued an updated load line certificate dated June 23, 2022.  Accordingly, after this date, the *Meg* was certified to go back to work and could have gone back to work.[77]

66.    On June 29, 2022, Offshore Aviation's counsel informed Skansi Marine's then-counsel via letter that Offshore Aviation wanted to confirm the termination of the 2021 charter "on or before June 30, 2022," and return possession of the *Meg* to Skansi Marine.  The letter stated that Offshore Aviation believed it had completed all requirements under the 2021 charter for redelivery and was returning the vessel with a USCG subchapter I certification.  Offshore Aviation was willing to sell to Skansi Marine the subchapter I equipment it had installed on the *Meg* for $123,800 as an offset to the charter hire that Offshore Aviation admitted was due for the period of May 1, 2022, to June 30, 2022 ($103,700).  It also noted that the value of the filters on board the

---

[74] *Id.*
[75] *Id.*
[76] Exhibits 51, 57, 132, 142, 163; Testimony of Nieten.
[77] Exhibit 51; Testimony of Nieten.

vessel was $2,911.50, and that Offshore Aviation intended to perform a final sounding to determine the amount of fuel on board the vessel at redelivery.[78]

67.     On July 1, 2022, Skansi Marine's then-counsel wrote to Offshore Aviation's counsel expressing disagreement that the requirements for redelivery of the *Meg* had been met and demanding that Offshore Aviation remedy all issues with the vessel stated in the Rivers & Gulf reports.[79]

68.     Skansi Marine personnel returned to the *Meg* on July 30 or August 1, 2022.[80]

## VIII.   REPAIRS OF THE *MEG* PERFORMED BY SKANSI MARINE

69.     Skansi Marine attempted to mitigate its damages by using its own personnel to complete repairs to the *Meg* when possible.   Third-party contractors were hired when Skansi Marine personnel were unable to do the repairs or when necessary to save time.[81]

70.     Juneau Marine Refrigeration & Air Conditioning Inc. repaired the HVAC and refrigeration systems beginning in July 2022.[82]

71.     Hydraulic Supply Company rebuilt the four hydraulic cylinders of the *Meg*'s steering system, and Skansi Marine personnel reinstalled them.[83]

72.     Skansi Marine hired contractors to repaint various areas of the vessel, which included the removal of rust, peeling paint, and soot that developed during the charter.[84]

---

[78] Exhibit 51.
[79] Exhibit 53.
[80] Testimony of Skansi.
[81] Exhibits 64, 65, 66, 67; Testimony of Skansi, Berthelot, Minster.
[82] Exhibit 67; Testimony of Berthelot.
[83] Exhibit 67; Testimony of Berthelot.
[84] Exhibits 64, 71; Testimony of Skansi, Berthelot.

73.     All the deficiencies identified in the off-charter inspections either had been corrected, or could have been corrected, with diligent application of available resources, on or before August 30, 2022.[85]

74.     In addition to repairing the *Meg*, Skansi Marine made improvements to the vessel that were not related to Offshore Aviation's use of the vessel such as replacing the dynamic positioning system.  As a result, the *Meg* was not ready to go back to work until the end of November 2022.[86]

## IX.   SKANSI MARINE'S DAMAGES

75.     Due to Offshore Aviation's failure to redeliver the *Meg* in the same condition as when the vessel went on-charter, Skansi Marine incurred the following costs and expenses for repairs to the *Meg*:

| | | |
|---|---|---|
| a. | Payments to contractors | $71,679.35[87] |
| b. | Contract labor | $8,342.84[88] |
| c. | Materials and supplies | $36,814.91[89] |
| d. | In-house labor | $140,287.50[90] |
| e. | Mileage for laborers | $6,016.87[91] |
| f. | Rental equipment | $750.00[92] |
| g. | Parts/supplies borrowed from the *M/V Nick L Skansi* | $3,904.96[93] |
| | Total | $267,796.43 |

---

[85] Exhibit 142; Testimony of Anselmi.
[86] Testimony of Skansi.
[87] Exhibits 65, 67.
[88] Exhibits 61, 64.
[89] Exhibit 62; Testimony of Skansi.
[90] Exhibits 60, 66.
[91] Exhibit 66.
[92] Exhibit 68.
[93] Testimony of Skansi.

76.     Skansi Marine also seeks $15,000 for inspections but cites only Skansi's trial testimony in support.  Skansi's rationale for this figure (which has no documentary support) is that, under the charter, Skansi Marine was owed a vessel having a year longer on its certificates than was redelivered by Offshore Aviation.  But because the Court has rejected Skansi Marine's argument that the *Meg* was not available to it until March of 2023, Skansi's rationale for recovery of the inspections line item fails.  Therefore, no amount will be awarded for inspections.

77.     Also, Skansi Marine seeks $37,486 in reimbursement for insurance premiums it paid from the time it took over the vessel after redelivery until November 2022.[94]  Because the Court is awarding lost charter hire until August 30, 2022 (when the 2021 charter expired) and is finding that all repairs could have been completed by that date, no amount will be awarded for insurance premiums Skansi Marine rightly incurred and paid.

78.     Thus, the total amount of damages for costs and expenses for repairs to the *Meg* awardable to Skansi Marine is $267.796.43.

79.     Skansi Marine also seeks lost profits totaling $1,062,675.25 from the loss of use of the *Meg* from May 1, 2022, until March 23, 2023 (325 days), at a rate of $3,269.77 per day.  The Court finds that this claim is speculative and conjectural as it is based on assumptions that the vessel possibly could have worked during that time but for Offshore Aviation's failure to redeliver the *Meg* pursuant to all requirements under the 2021 charter.  However, the *Meg* was unavailable for some of this period due to the improvements Skansi Marine chose to make to the vessel, and there is no positive evidence that the *Meg* would have been fully utilized during the relevant period or that it could have earned such a high day rate.  In fact, Skansi Marine's own evidence established that jobs were scarcer in the late fall and winter months, which was about the time (November

---

[94] Exhibit 59; Testimony of Skansi.

2022) when the *Meg* would have become available following installation of the improvements. Therefore, the Court will not award lost profits.

## CONCLUSIONS OF LAW

1.     A charter party is a maritime contract.  *See Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir. 1986).

2.     The interpretation of a maritime contract is a question of law.  *Barrios v. Centaur, L.L.C.*, 942 F.3d 670, 680 (5th Cir. 2019).

3.     "'As a general rule, admiralty law applies to all maritime contracts.'"  1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5:1 (6th ed. 2018) (quoting *Aqua-Marine Constructors, Inc. v. Bank*s, 110 F.3d 663, 670 (9th Cir. 1997)); *see also LLOG Expl. Co. v. Signet Mar. Corp.*, 673 F. App'x 422, 425 (5th Cir. 2016) ("'When interpreting maritime contracts, federal admiralty law rather than state law applies.'") (quoting *Int'l Marine, L.L.C. v. Delta Towing, L.L.C.*, 704 F.3d 350, 354 (5th Cir. 2013)).  "The general maritime law is the product of the maritime jurisprudence of the federal courts" and "'is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules'" that are "'[d]rawn from state and federal sources.'"  SCHOENBAUM § 5:1 (quoting *E. River S.S. Corp. v. Transam. Delaval, Inc.*, 476 U.S. 858, 864-65 (1986)).

4.     Applying federal law in the context of maritime contracts "'includes looking to principles of general contract law that can be found in treatises or restatements of the law.'"  *Int'l Marine, L.L.C. v. FDT, L.L.C.*, 619 F. App'x 342, 349 (5th Cir. 2015) (quoting *Univ. of Tex. Sys. v. United States*, 759 F.3d 437, 443 (5th Cir. 2014)) (internal quotation marks omitted).

5.     "In maritime contract disputes, federal courts apply general principles of contract law.  However, to the extent that it is not inconsistent with admiralty principles, state contract law

may be applicable to maritime contracts." *In re Tasch, Inc.*, 46 F. App'x 731, at *2 (5th Cir. 2002) (internal citations omitted).

6.      The elements of a breach-of-contract claim under federal maritime law are (1) a contract between the parties; (2) a breach of that contract; and (3) damages. *FEC Heliports, LLC v. Hornbeck Offshore Operators, LLC*, 2016 WL 5678557, at *5 (E.D. La. Oct. 3, 2016) (citing 17A AM. JUR. 2D *Contracts* § 702 (2016)).

7.      "It is fundamental contract law that a party that breaches a contract is liable for the damages caused by its failure to satisfy its contractual obligations." *Tidewater Marine, Inc. v. Sanco Int'l, Inc.*, 113 F. Supp. 2d 987, 999 (E.D. La. 2000) (citing *Ogea v. Loffland Bros. Co., Inc.*, 622 F.2d 186, 189 (5th Cir. 1980)).

8.      "When interpreting a maritime contract, the general rules of contract construction and interpretation apply" and courts must read each provision of a contract in light of the other provisions so as to give each the meaning reflected by the contract as a whole. *Baywater Drilling, LLC v. Sw. Energy Partners, LLC*, 2017 WL 3658862, at *3 (E.D. La. June 23, 2017), *aff'd*, 721 F. App'x 330 (5th Cir. 2018); *see also Marine Overseas Servs., Inc. v. Crossocean Shipping Co.*, 791 F.2d 1227, 1234 (5th Cir. 1986) (applying general rules of contract construction to a charter party).  Moreover, all the provisions of a charter party must be interpreted without rendering any of them meaningless. *Chembulk Trading LLC v. Chemtex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004)

9.      "The determination of whether a maritime contract is ambiguous is a question of law for the Court." *Lytal Enters., Inc. v. Newfield Expl. Co.*, 2007 WL 1239130, at *4 (E.D. La. Apr. 27, 2007).  A contract is unambiguous if "its language as a whole is clear, explicit, and leads to no absurd consequences, and as such it can be given only one reasonable interpretation." *Chembulk Trading*, 393 F.3d at 555 n.6.  "[A] court may not look beyond the written language of

the document to determine the intent of the parties unless the disputed contract provision is ambiguous." *Corbitt v. Diamond M. Drilling Co*., 654 F.2d 329, 332-33 (5th Cir. 1981).

10.     Notwithstanding both parties' requests to do so, the Court does not look to extrinsic or parol evidence to construe the 2019 and 2021 charters, finding that their relevant provisions are unambiguous and lead to no absurd consequences.

11.     Here, Offshore Aviation breached the 2021 charter by improperly and prematurely cancelling the 2021 charter.  Offshore Aviation relies on the second to last sentence of section 4.3 to support its argument that it properly cancelled the contract, with 30 days' notice, on January 11, 2022 (effective February 11, 2022).  However, when the charter is read as a whole, as contracts must be, the 30-day cancellation option could be exercised by Offshore Aviation only if Skansi Marine disturbed its quiet enjoyment of the *Meg*.  There is no evidence that Skansi Marine disrupted Offshore Aviation's quiet enjoyment of the vessel during the 2021 charter.  Therefore, the cancellation provision was not triggered.[95]  Because the 2021 charter was never properly cancelled, even after Offshore Aviation returned the vessel to Skansi Marine on June 30, 2022, Offshore Aviation owes to Skansi Marine charter hire for the *Meg* at the contractual rate of $1,700 per day for the balance of the charter term for which it had not paid – that is, the period from May 1, 2022, through August 29, 2022 (121 days) – for a total amount of $205,700 in charter hire due.

12.     Offshore Aviation also breached the 2021 charter by returning the vessel to Skansi Marine in a condition that was different from that documented in the on-charter survey.  The Rivers & Gulf off-charter survey reports establish that the *Meg* was returned to Skansi Marine with

---

[95] Offshore Aviation argues that such a reading renders meaningless the 2021 insertion of this sentence into section 4.3 because Offshore Aviation, as charterer, already had the right to terminate the charter if the covenant of quiet enjoyment were breached by Skansi Marine.  However, the 2019 charter contained no provision regarding timing.  The sentence added in 2021 provided a specific 30-day period for the effectiveness of the cancellation – which the evidence showed was important to Offshore Aviation given its concern that Skansi Marine might sell the *Meg* during the charter period.

numerous deficiencies that it did not have when it went on charter.  Skansi Marine established that it spent $267,796.43 in labor and materials to repair the issues.  Offshore Aviation does not contest the specific amounts claimed by Skansi Marine for the repairs it made, except to say that the vessel was returned in a "serviceable" condition and that was sufficient.  The charter, though, essentially defined the required "serviceable" condition for redelivery to be the *Meg*'s condition memorialized in the on-charter survey, less normal wear and tear.  The evidence presented by Offshore Aviation did not specifically controvert, much less undermine, Skansi Marine's showing of the nature of the repairs and their cost.  Thus, Skansi Marine is entitled to recover this amount.

13.     As noted above, Skansi Marine is not entitled to recover damages for lost profits due to any loss of use of the *Meg*.  As of June 24, 2022, the vessel had acquired the USCG and ABS certificates that would have enabled it to go back to work.  At that point, the 2021 charter had not expired and Offshore Aviation was required to pay charter hire.  The testimony at trial established that the deficiencies remaining on the *Meg* as of June 24, 2022, could have been repaired within 30 days, but certainly before the expiration of the charter.  Two months elapsed from the date that Offshore Aviation returned the vessel (June 30, 2022) until the 2021 charter expired (August 30, 2022).  Skansi Marine could have completed all necessary deficiencies found in the off-charter survey within this time and put the vessel back in service when the 2021 charter expired.  On this ground alone, then, the Court will not award any lost profits to Skansi Marine.

14.     However, as found above, the evidence adduced by Skansi Marine amounts to speculation and conjecture and thus is also inadequate to support its claim for lost profits. Therefore, Skansi Marine has not proven lost profits with reasonable certainty, as is required under the law.  *See, e.g., Dow Chem. Co. v. M/V Roberta Taylor*, 815 F.2d 1037, 1042 (5th Cir. 1987). The availability of other work, especially at the unsubstantiated daily charter and utilization rates

urged by Skansi Marine, was not established with reasonable certainty by the evidence presented at trial.  After all, the *Meg* was rendered unavailable for a portion of the claimed lost-profits period (through November 2022) due to the improvements Skansi Marine chose to install on the vessel, and the late fall and winter months immediately following were a particularly difficult time to find work.

15.    Offshore Aviation owes Skansi Marine a total of $473,496.43 for its breach of the 2021 charter – that is, $205,700.00 in charter hire and $267.796.43 in labor and materials to return the vessel to its on-charter condition.  But Offshore Aviation is entitled, by the terms of the 2021 charter, to a credit for the value of the equipment it installed on the *Meg* to obtain the USCG subchapter I certification.

16.    This credit, however, is not due, as Offshore Aviation claims, for Skansi Marine's failure to deliver the *Meg* with a USCG subchapter I certification.  While the 2019 charter did state that Skansi Marine was to deliver the vessel to Offshore Aviation with a USCG subchapter I certification, Offshore Aviation accepted the vessel with only a USCG subchapter L certification and then paid for and installed the equipment necessary to obtain the USCG subchapter I certification.  At that time, Offshore Aviation had the option to purchase the vessel and, if it had, it would have retained the subchapter I equipment and continued to benefit from it.  When the parties negotiated the 2021 charter, the purchase option was removed.  Thus, the Court rejects Offshore Aviation's effort to claim recompense for the cost of the subchapter I equipment as a breach or default of the charter on the part of Skansi Marine.  Yet, the parties in their charter provided another means for handling this question.

17.    Both the 2019 charter and the 2021 charter include language in section 6.3 that allowed Offshore Aviation to put machinery and equipment onto the *Meg* and retain the rights to

23

that equipment unless it notified Skansi Marine of its intent to abandon it.  Offshore Aviation never informed Skansi Marine that it intended to abandon the subchapter I equipment.  And Skansi Marine never invoked its corollary right under section 6.3 to demand removal of the equipment prior to redelivery.  Instead, Skansi Marine chose to enjoy the fruits of the subchapter I certification made possible by the equipment Offshore Aviation installed.   Therefore, implicit in these provisions of section 6.3 of the charter is Offshore Aviation's right to be reimbursed for the value of that equipment, which, in this instance, should take the form of a credit against the amounts Offshore Aviation owes to Skansi Marine.  The Court determines that the appropriate amount of the credit is $123,800.00, which is the amount Offshore Aviation indicated in its June 29, 2022 letter to Skansi Marine was its cost for the subchapter I equipment and had then offered by way of offset.[96]

18.     The 2021 charter also provides that Skansi Marine must pay to Offshore Aviation the value of the filters, oil, and fuel aboard the *Meg* upon redelivery.  The value of the filters is $2,911.50.  This amount will also be applied as a credit against what Offshore Aviation owes to Skansi Marine.   However, there is no evidence as to the value of the oil or fuel, so Offshore Aviation will not receive a credit for those amounts.

---

[96] Because the Court finds that offset is an equitable result based on the contract, the Court need not apply Maryland law on voluntary payment.  Skansi Marine argues that Offshore Aviation cannot receive any credits against the amounts it owes because it paid the charter hire without complaint throughout most of the contractual period. However, given the charter provisions and the parties' course of dealings, there was no reason for Offshore Aviation to withhold charter hire during the life of the contract because it believed that any amount it was owed for the subchapter I conversion would be worked out at the end of the parties' relationship.  This is evidenced by section 6.3 of both the 2019 and 2021 charters which stated that, at the end of the contract, Offshore Aviation could remove whatever equipment it put on the vessel unless it notified Skansi Marine of an intent to abandon it.  Regardless, even if the offset could only be taken against withheld charter hire, the Court's award of charter hire herein ($205,700) provides ample coverage for the credit for the subchapter I equipment ($123,800).

19.     In sum, subtracting the credits of $123,800.00 and $2,911.50 Skansi Marine owes Offshore Aviation from the $473,496.43 Offshore Aviation owes to Skansi Marine, Skansi Marine is due $346,784.93 from Offshore Aviation.

20.     The contract provides for attorney's fees to the prevailing party.   The Fifth Circuit has adopted for maritime cases the definition of "prevailing party" enunciated in the context of cases arising under 42 U.S.C. § 1988.  *See Genesis Marine, L.L.C. v. Hornbeck Offshore Servs., L.L.C.,* 951 F.3d 629, 631 (5th Cir. 2020).  Thus, a "'plaintiff prevails when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.'"  *Id.* (quoting *Farrar v. Hobby*, 506 U.S. 103, 111-12, (1992)).  "And 'a judgment for damages in any amount modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay.'"  *Id.* (quoting *Farrar*, 506 U.S. at 113) (alterations omitted).

21.     Here, as in *Genesis Marine*, there are two prevailing parties under this definition. Skansi Marine has prevailed in some respects and Offshore Aviation in others.  *See Fox v. Vice*, 563 U.S. 826, 835 (2011) (concluding, in the § 1988 context, that "a court could properly award fees to both parties" when a plaintiff prevailed on one claim and a defendant defeated a separate claim).  "[G]iven that fact, [a] district court [is] entitled in its discretion to make an assessment as to the reasonableness of awarding fees to both parties or, conversely, neither."  *Genesis Marine*, 951 F.3d at 632.  To do so in this case, the Court will assess the reasonableness of an award of costs and fees to Skansi Marine pursuant to the 2021 charter after subsequent briefing on that issue. In particular, the parties are ordered to address what portion of Skansi Marine's costs and fees may be reasonably and equitably awarded in light of the issues on which it prevailed and those on which it did not.

Accordingly, for the foregoing reasons,

IT IS ORDERED that there be judgment in favor of plaintiff Skansi Marine and against defendant Offshore Aviation in the amount of $346,784.93.

IT IS FURTHER ORDERED that Skansi Marine file a brief by December 8, 2023, addressing the costs and fees to which it believes it is entitled under the *Genesis Marine* standard and providing evidence for same.  Offshore Aviation shall file its response by January 8, 2024.

New Orleans, Louisiana, this 9th day of November, 2023.


                                                                                                    _____
                                                                                                    BARRY W. ASHE
                                                                                                    UNITED STATES DISTRICT JUDGE